# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MICHAEL P. WAGNER,                                    Case No. 1:10-cv-784

     Plaintiff                                       Beckwith, J.
                                                      Litkovitz, M.J.

     vs

MICHAEL J. ASTRUE,                                    **REPORT AND**
COMMISSIONER OF                                       **RECOMMENDATION**
SOCIAL SECURITY,

     Defendant


Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's

application for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").

This matter is before the Court on plaintiff's Statement of Specific Errors (Doc. 8), the

Commissioner's Memorandum in Opposition (Doc. 13), and plaintiff's Reply.  (Doc. 14).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1960 and was 50 years old at the time of the administrative law

judge's ("ALJ") decision.  (Tr. 136).  He obtained a high school diploma and received

construction certification in 2000.  (Tr. 192).  Plaintiff has past work experience as a carpenter

and as an ink technician for a printing company.  (Tr. 194).  Plaintiff filed DIB and SSI

applications in January 2008, alleging a disability onset date of August 9, 2007, due to back and

neck pain and chronic pain syndrome.  (Tr. 144, 147).  The application was denied initially and

upon reconsideration.  Plaintiff then requested and was granted a *de novo* hearing before ALJ

Christopher B. McNeil.  (Tr. 116).  On February 25, 2010, plaintiff, represented by counsel,

appeared and testified at the hearing.  (Tr. 44-58).  A medical expert ("ME"), Dr. Mary Eileen

Buban, appeared and testified at the hearing.  (Tr. 37-44).  Also, a vocational expert ("VE"),

Mark A. Pinti, appeared and testified.  (Tr. 58-64).

On May 17, 2010, the ALJ issued a decision denying plaintiff's SSI and DIB applications.

(Tr. 9-26).  The ALJ found that plaintiff last met the insured status requirements for DIB on

August 9, 2007.  (Tr. 14).  The ALJ determined that plaintiff suffers from the following severe

impairments: degenerative disc disease, failed back surgery syndrome, and pain disorder.  (Tr.

14).  The ALJ found that these severe impairments, considered singly and in combination, did

not meet or equal the level of severity described in sections 1.04 or 12.07 of the Listing of

Impairments ("Listings"), or any other section of the Listings, 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (Tr. 15-16).

The ALJ determined that plaintiff retains the residual functional capacity ("RFC") to

perform a range of light work with the following limitations:

> the claimant can lift and/or carry up to twenty pounds occasionally and ten pounds
> frequently as well as push and/or pull up to ten pounds using hand or foot controls.
> Moreover, he can sit approximately six hours in an eight-hour workday and
> stand/walk about six hours in an eight-hour workday.  The claimant can perform
> occasional stooping, crouching and overhead reaching, but should never climb
> ladders, ropes, and/or scaffolds and should avoid exposure to unprotected heights and
> hazardous machinery.  Further, the claimant retains the mental capacity to perform
> simple, repetitive tasks in a static setting that does not impose fast pace or strict
> production standards, where interpersonal exchanges are superficial.

(Tr. 16).  The ALJ found that plaintiff's medically determined impairments could reasonably be

expected to cause the alleged symptoms, but plaintiff's statements concerning the intensity,

persistence and limiting effects of these symptoms are not credible to the extent they are

inconsistent with the RFC assessment.  (Tr. 18).  The ALJ determined that the plaintiff was

2

unable to do his past relevant work. (Tr. 24). However, based on the VE's testimony, the ALJ determined that jobs exist in significant numbers in the national economy, such as light packager, light inspector, sedentary inspector, and sedentary sorter that plaintiff could perform given his RFC to perform light to sedentary unskilled work. (Tr. 25). Consequently, the ALJ concluded that plaintiff is not disabled under the Social Security Act and therefore not entitled to SSI or DIB benefits. (Tr. 26).

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner. (Tr. 1-4).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(I), 423(a). Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental

3

impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Social Security Act.  42 U.S.C. § 1382a; 20 C.F.R. § 416.202.  Eligibility is dependent upon disability, income, and other financial resources.  20 C.F.R. § 416.202.  To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months.  Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy.  20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations which is the same for purposes of both DIB and SSI benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends.  Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends.  Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment meets or equals any

4

within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d).

Fourth, if the individual's impairments do not meet or equal those in the Listing, the

Commissioner must determine whether the impairments prevent the performance of the

individual's regular previous employment. If the individual is unable to perform the relevant past

work, then a prima facie case of disability is established and the burden of going forward with the

evidence shifts to the Commissioner to show that there is work in the national economy which

the individual can perform. *Lashley v. Sec'y of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v.

Sec'y of H.H.S.*, 667 F.2d 524 (6th Cir. 1981).

Plaintiff has the burden of establishing disability by a preponderance of the evidence.

*Born v. Sec'y of H.H.S.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d

1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

plaintiff can perform other substantial gainful employment and that such employment exists in

the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at

1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the

Commissioner must come forward with particularized proof of plaintiff's individual capacity to

perform alternate work considering plaintiff's age, education, and background, as well as the job

requirements. *O'Banner v. Sec'y of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also

Richardson v. Sec'y of H.H.S.*, 735 F.2d 962, 964 (6th Cir. 1984) (per curiam). Alternatively, in

certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the

"grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2;

*O'Banner*, 587 F.2d at 323. *See also Cole v. Sec'y of H.H.S.*, 820 F.2d 768, 771 (6th Cir. 1987).

5

When the grid is not applicable, the Commissioner must make more than a generalized finding that work is available in the national economy; there must be "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs." *Richardson*, 735 F.2d at 964 (emphasis in original); *O'Banner,* 587 F.2d at 323.  Taking notice of job availability and requirements is disfavored.  *Kirk,* 667 F.2d at 536-37 n.7, 540 n.9.  There must be more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy.  *Richardson,* 735 F.2d at 964; *Kirk,* 667 F.2d at 536-37 n.7.  The Commissioner is not permitted to equate the existence of certain work with plaintiff's capacity for such work on the basis of the Commissioner's own opinion.  This crucial gap is bridged only through specific proof of plaintiff's individual capacity, as well as proof of the requirements of the relevant jobs.  *Phillips* v. *Harris,* 488 F. Supp. 1161 (W.D. Va. 1980) (citing *Taylor v. Weinberger,* 512 F.2d 664 (4th Cir. 1975)).  When the grid is inapplicable, the testimony of a vocational expert is required to show the availability of jobs that plaintiff can perform.  *Born*, 923 F.2d at 1174; *Varley* v. *Sec'y of H.H.S.,* 820 F.2d 777, 779 (6th Cir. 1987).

A mental impairment may constitute a disability within the meaning of the Act.  *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  However, the mere presence of a mental impairment does not establish entitlement to disability benefits.  In order for a claimant to recover benefits, the alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings.  20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical impairments.  Once the Commissioner determines that a mental impairment exists, he/she must

6

then evaluate the degree of functional loss it causes according to a special procedure.  20 C.F.R. §§ 404.1520a and 416.920a.  A standard review technique is completed at each level of administrative review for mental impairments.  *Id*.

This special procedure requires a rating of the degree of functional loss resulting from the impairment.  20 C.F.R. § 404.1520a(c)(3).  Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation.  *See Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1993) (per curiam).  The degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) is rated using a five-point scale: none, mild, moderate, marked, and extreme.  The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: none, one or two, three, four or more.  The last point on each scale represents a degree of limitation that is incompatible with the ability to do *any* gainful activity.  20 C.F.R. § 404.1520a(c)(4).  Ratings above "none" and "mild" in the first three functional areas and "none" in the fourth functional area are considered severe.  20 C.F.R. § 404.1520a(d)(1).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder.  The Listings for mental disorders, with the exception of Listings 12.05 (mental retardation and autism) and 12.09 (substance addiction disorders), contain two parts, referred to as the Part A criteria and the Part B criteria.  The Part A criteria consists of clinical findings which medically substantiate the presence of a mental disorder.  To meet Listing 12.07, somatoform disorders, one of the Part A criteria must be met.  The Part B criteria consist of a list of functional restrictions which are associated with mental

7

disorders and are incompatible with the ability to work.  To meet listing 12.07, two of the Part B criteria must be met.

If a mental impairment does not meet or equal a listed mental disorder, the Commissioner must then assess plaintiff's mental residual functional capacity.  The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment.  *See* 20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted.  The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued.  *DeGrande v. Sec'y of H.H.S.*, 892 F.2d 1043, 1990 WL 94, at *3 (6th Cir. Jan. 2, 1990).  Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).  Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing.  *Faucher*, 17 F.3d at 173.

8

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec'y of H.H.S.*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL RECORD

The record contains plaintiff's medical treatment history from 2000 to 2009. (Tr. 285-603).

In December 2000, plaintiff received a cervical spine MRI from Marcus Oswald, M.D., at Tri-County Imaging. (Tr. 285). The MRI indicated a broad based diffuse disc protrusion at C5-6, slightly greater to the left, and C6-7, greater to the right, with neither protrusion resulting in cord contact or deformity. (Tr. 285). In April 2001, plaintiff was treated by Steven Perlman, M.D., for back pain at Jewish Hospital and received MRIs of his spine and upper extremities which demonstrated annular bulges at L3-4, L4-5, and L5-S1 and decreased TI vertebral marrow signal. (Tr. 293). The MRI of the upper extremities indicated mild AC joint arthropathy and a mildly tendonopathic rotator cuff with mild subacromial-subdeltoid bursitis and mild peritendinitis. (Tr. 294). The records note the injuries resulted from a 25 foot fall in May 2000. (Tr. 293).

In January 2003, plaintiff was treated at Reading Chiropractic where he received a

thoracic/lumbo-sacral exam and was diagnosed with a lumbo-sacral sprain/strain.  (Tr. 288-89).

Plaintiff was treated at Woeste Chiropractic on November 16, 2006 and February 19, 2007 for

complaints of worsening lower back pain extending into legs and accompanying numbness, neck

pain, and constant right shoulder pain.  (Tr. 296-99).  Objective findings included mild

tenderness and moderate hypertonicity in the cervical and lumbar para spinal muscles and review

of a 2001 MRI indicated disc bulges and right shoulder mild acromioclavicular joint arthropathy

and mildly tendonopathic rotator cuff with mild bursitis and peritendinitis.  (Tr. 299).

    In February 2007, plaintiff was treated by John M. Collins, M.D., where he received a

fluoroscopy and lumbar epidural steroid injection.  (Tr. 337).  Plaintiff reported back pain,

greater on the left side, extending to his legs.  (Tr. 337).  Plaintiff further reported suicidal

ideation as a result of his physical condition.  (Tr. 338).  Dr. Collins diagnosed plaintiff with

annular bulges, foraminal stenosis, and facet arthropathy with chronic low back pain and leg

symptoms, further noting that the pain was possibly facetogenic as opposed to secondary to the

disk displacements, and recommended that plaintiff return in three weeks for another injection.

(Tr. 338).  Plaintiff returned in March 2007 and received another epidural steroid injection.  (Tr.

335).  Plaintiff again complained of severe back pain, leg pain and numbness in the left leg.  (Tr.

335).  Richard Gregg, M.D., recommended further steroid injections pending the outcome of the

treatment.  (Tr. 336).

    Plaintiff was seen at Beacon Orthopaedics by Jaideep Chunduri, M.D., on April 18, 2007

complaining of chronic low back and left leg pain which he described as an 8 on a scale of 0 to

10, and further complaining of numbness in his left leg.  (Tr. 312).  Dr. Chunduri noted that

plaintiff walked with a left leg limp and diagnosed chronic lumbosacral strain and recommended

an MRI.  (Tr. 312).  X-rays on that day showed degenerative disc disease from L3 to the sacrum

and an MRI on April 22, 2007, demonstrated left L4-5 stenosis, left L5-S1 disc herniation, and

multi-level disc bulging and degeneration.  (Tr. 311).  Plaintiff was advised by Dr. Chunduri to

undergo a discogram for further evaluation and treatment.  (Tr. 311).

On May 22, 2007, plaintiff was treated by Sairam Atluri, M.D., at Mercy Hospital

Anderson for low back pain accompanied by shooting pain down his left leg.  (Tr. 300-01).  He

received a discogram at L2-3, L3-4, L4-5, and L5-S1 which was positive at L5-S1.  (Tr. 303).

Following the discogram, plaintiff saw Dr. Chunduri in May 2007 who diagnosed chronic

lumbosacral strain, left L4-5 stenosis, multi-level disc degeneration, and left L5-S1 herniation.

(Tr. 310).  Dr. Chunduri recommended an anterior lumbar interbody fusion from L4 to the

sacrum, noting that plaintiff should expect only 50% improvement.  *Id*.  Plaintiff stated he would

be happy with 50% improvement at that time.  *Id*.

Plaintiff returned to Dr. Chunduri in July 2007 for reevaluation prior to surgery and

voiced concerns about having hardware implanted in his back.  (Tr. 309).  Plaintiff  stated he

wanted to cancel his surgery to see how his symptoms improved as his back pain had recently

disappeared, and stated several times that he was struggling financially.  (Tr. 309).

However, the next month plaintiff's pain returned at a 10 on a scale of 0 to 10 and on

August 9, 2007, he underwent surgery at Grandview/Southview Hospitals and received a

microscopic lumbar laminectomy with discectomy of the L5-S1 left disc.  (Tr. 317- 19).  Scott C.

West, D.O., performed the procedure and noted that plaintiff was positive for anxiety and

depression pre-surgery.  (Tr. 317).  In November 2007, plaintiff underwent a MRI which showed

normal alignment but moderate disc space loss at L3-4 and L5-S1 and mild disc space loss at L2-

11

L3 and L4-L5.  (Tr. 322).  In a December 17, 2007 letter to Earl Scheidler, D.O., Dr. West

informed Dr. Scheidler that following the August 2007 surgery plaintiff initially did well but had

recently begun to experience increasing leg and back pain and had at times been restricted to

laying in a prone position for several days.  (Tr. 344).  Dr. West diagnosed degenerative disc

changes with foraminal stenosis at L4-5 and L5-S1 on the left.  (Tr. 345).

On December 26, 2007, plaintiff was evaluated by John M. Collins, M.D., at Christ

Hospital where he received a fluoroscopy and left sacral S1 transforaminal epidural steroid

injection.  (Tr. 333).  Plaintiff reported that following his August 2007 surgery he had some relief

but had recently begun to experience increasing amounts of left leg pain and numbness and

continued to experience sharp back pain.  (Tr. 333).  Dr. Collins diagnosed bilateral low back

pain with left S1 radicular pain and recommended a repeat injection as needed in a month.  (Tr.

334).  In January 2008, Dr. West composed a second letter to Dr. Scheidler repeating his

diagnosis that plaintiff had degenerative disc disease with foraminal stenosis at L4-5 and L5-S1

on the left and explained that he advised plaintiff against lumbar fusion surgery due to only a

50/50 chance that it would be beneficial.  (Tr. 343).

On February 6, 2008, Alfred Kahn, M.D., examined plaintiff pursuant to a referral from

Dr. Scheidler and noted that while fusion surgery may offer some relief, plaintiff was ineligible at

that time due to a lack of health insurance benefits.  (Tr. 443).  Also in February 2008, plaintiff

was contacted by Social Security employee Nicole D. Martin and acknowledged he was suffering

from depression but did not feel it was severe and insisted that he did not want psychological

treatment and/or medication as his pain medication already impaired him physically.  (Tr. 204).

At the request of the Social Security Administration, plaintiff underwent a psychological

examination in February 2008 with Susan L. Kenford, Ph.D.  (Tr. 354-60).  Plaintiff reported that

he had been dealing with continuous pain since his fall in 2000.  (Tr. 354).  Plaintiff stated that

he stopped taking a prescription for Geodon after learning that it was for treatment of bipolar

disorder and psychotic symptoms and expressed anger at being prescribed the medication,

reiterating his belief that his problems were purely physical.  (Tr. 355).  Dr. Kenford noted that

plaintiff demonstrated problems with motor behaviors, including walking with a slow and

awkward gait, having problems walking up stairs, appearing uncomfortable, and experiencing

upper body twitches throughout the evaluation.  (Tr. 356).  Plaintiff also appeared agitated and

expressed frustration with his medical care, citing insufficient pain management medication, and

he was extremely focused on his somatic condition.  (Tr. 356).

Plaintiff acknowledged that he had suicidal ideation shortly after the injury but denied

recent suicidal thoughts, though he admitted to having occasional crying spells.  (Tr. 357).

Plaintiff reported a feeling of alienation from friends resulting from his excessive need to talk

about his pain condition and associated frustration.  (Tr. 358).  Dr. Kenford opined that plaintiff

exhibited medication seeking behavior and seemed convinced that the only solution to his pain

was pharmacological, noting that his focus on medication was atypical and that plaintiff appeared

insulted at the insinuation of mental health issues not related to his pain.  (Tr. 358).  Dr. Kenford

concluded that plaintiff was significantly impaired by an underlying organic pain condition as

well as a psychological overlay.  (Tr. 359).  Dr. Kenford assigned plaintiff a GAF[1] of 45 due to

his pain condition and opined that he was not able to retain employment.  (Tr. 359).  Specifically,

---

[1]  The Global Assessment Functioning (GAF) is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation.  *See Martin v. Commissioner*, 61 F. App'x 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision ("DSM-IV-TR") at 32-34.

13

Dr. Kenford stated that plaintiff's ability to get along with others was moderately impaired by his pain condition and his focus on it, that his ability to perform simple repetitive tasks was markedly impaired by his pain condition, his entire psyche revolved around his thoughts of relief from pain, and his ability to handle the every day stresses and pressures of a work environment was extremely impaired.  (Tr. 359)

On April 1, 2008, reviewing agency psychologist, Aracelis Rivera, Psy.D., completed a mental RFC assessment of plaintiff.  (Tr. 364-67).  Dr. Rivera rejected portions of Dr. Kenford's diagnosis and found that plaintiff was able to retain employment.  *Id*.  Specifically, Dr. Rivera found that plaintiff was only moderately limited in his abilities to understand, remember, and carry out either very short and simple or detailed instructions, to perform activities within a schedule and maintain regular attendance, to sustain an ordinary routine without special supervision, to work in coordination with others without distraction, and to make simple work related decisions.  (Tr. 364).  Dr. Rivera further opined that plaintiff was not significantly limited in his ability to maintain attention and concentration for extended periods, but did find that he was moderately limited in his ability to complete a normal work week without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 364-65).

Regarding plaintiff's social interaction, Dr. Rivera found that plaintiff was not significantly limited in his ability to ask simple questions, request assistance, or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, but was moderately limited in his abilities to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with

14

coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 365).  Dr. Rivera further opined that plaintiff was moderately limited in his abilities to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others, but was not significantly limited in his abilities to be aware of normal hazards, take appropriate precautions, or travel in unfamiliar places and take public transportation.  (Tr. 365).

On April 10, 2008, plaintiff was admitted to Christ Hospital for four days for a second back surgery, specifically, surgical decompression and global lumbar fusion surgery conducted by Dr. Kahn.  (Tr. 382).  Upon discharge, plaintiff was advised to wear a back brace 23 hours a day, limited to lifting five pounds and to sitting for only fifteen minute periods, and was instructed to walk for short periods daily, increasing over time and as able.  (Tr. 382).

In an April 15, 2008 physical RFC assessment, agency reviewing doctor Esberdad Villanueva, M.D., determined that plaintiff was physically capable of retaining work with limitations that he only occasional lift and/or carry and push and/or pull twenty pounds, ten pounds frequently; that he could stand and/or walk approximately six hours in an eight-hour workday; sit about six hours in and eight hour workday; stoop and crouch occasionally; and never climb ladders, ropes, or scaffolds.  (Tr. 401-08).

In May 2008, Dr. Kahn had a post-operative consultation with plaintiff and noted that the x-rays looked good and that plaintiff was walking as directed.  (Tr. 480).  Dr. Kahn advised future physical therapy and noted that plaintiff would definitely not be able to return to work through August 2008 and may be permanently disabled.  *Id*.  A subsequent MRI revealed mild

disc space loss, mild facet hypertrophy and mild foraminal stenosis.  (Tr. 427).  Plaintiff

consequently received an epidural steroid injection.  (Tr. 509).

      In August 2008, agency reviewing psychologist, Cynthia Waggoner, Psy.D., affirmed Dr.

Rivera's April 2008 mental RFC assessment.  (Tr. 497).  In October 2008, agency reviewing

physician Teresita Cruz, M.D., affirmed Dr. Villanueva's findings regarding plaintiff's physical

capacity to do work.  (Tr. 498-505).

      Plaintiff was treated at University Hospital in October and November 2008 for

complaints of back pain.  He was prescribed Vicodin and was advised to follow up with a pain

clinic.  (Tr. 547-51).  Plaintiff was then treated at the University Hospital Ambulatory Pain

Center from 2008 to 2010 where he received steroid injections and pain medication.  (Tr. 528-46,

578-603).

      Plaintiff attended physical therapy sessions in February and March 2009, and in May

2009, plaintiff went to the Drake Center and met with physical therapist Cynthia Lear who

conducted a Functional Capacities Evaluation ("FCE").  (Tr. 516-19; 521-26).  Ms. Lear opined

that plaintiff would likely not be successful in vocational rehabilitation and that employment was

unlikely.  (Tr. 521).

      A May 2009 MRI of plaintiff's cervical and lumbar spine demonstrated moderate

multilevel cervical spondylosis with significant foraminal narrowing, but no cord compression,

and degenerative disc disease with mild central stenosis and mild to moderate bilateral foraminal

narrowing.  (Tr. 517-19).

      In January 2010, Mary Eileen Buban, Psy.D., completed interrogatories at the request of

the ALJ and, evaluating plaintiff under Listing 12.07, found that plaintiff had been disabled by

16

his pain disorder since February 2008.  (Tr. 564-68).  Specifically, Dr. Buban found that plaintiff

was moderately impaired in his daily living activities and markedly impaired in his abilities to

maintain social functioning and maintain concentration, persistence or pace.  (Tr. 565).

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the administrative hearing that after his August 9, 2007 surgery he

was limited to minor exercise such as walking and light housework.  (Tr. 45-46).  Plaintiff

reported that he had difficulties going downstairs to do laundry because he experienced back pain

that would shoot down his legs, but that he lived alone and continued to do the housework he

was able to as there was no one available to assist him.  (Tr. 46-47).  Plaintiff stated that he does

laundry once a week on average, but sometimes he is unable to do any housework due to

excruciating pain and on those days he manages the pain with medication.  (Tr. 53).  Plaintiff

further testified that after the 2007 surgery he experienced relief from pain for approximately two

months before it worsened and he underwent a second surgery in April 2008.  (Tr. 47).  Plaintiff

stated that after the 2008 fusion surgery he wore a turtle shell back brace and was in recovery for

a few months.  (Tr. 47-48).

Plaintiff testified that after the 2007 surgery he would occasionally walk for a couple of

miles at a slow pace to go grocery shopping, taking breaks at benches to rest, but that if he had

transportation he would not have chosen to walk.  (Tr. 48-49).  Plaintiff further testified that after

the 2008 surgery walking was more difficult.  (Tr. 49).  Plaintiff reported he was able to stand for

up to an hour, sometimes less, without sitting down and that sitting is difficult and, on average,

he is able to sit for thirty minutes at a time.  (Tr. 49-50).  Plaintiff testified that he is most

comfortable in a reclined position, which is how he spends most of his time.  (Tr. 50-51).

Plaintiff testified that since the 2007 surgery he would not be able to sustain an eight-hour work day five days a week without the use of a recliner. (Tr. 51). Plaintiff reported that he is able to comfortably lift 10 to 20 pounds from a table, but would be unable to lift this weight from the floor. (Tr. 51). Plaintiff reported that when he visits the grocery store he generally carries home less than ten pounds of groceries at a time and upon returning home he usually requires a recovery period where he lays in the recliner or takes medication to lessen the pain. (Tr. 52).

Plaintiff testified that he occasionally visits family but not for long periods of time due to pain and his need to rest in a reclined position. (Tr. 52). Plaintiff stated that after spending four hours with family during Easter he experienced significant pain and had to take pain medication and go home to recover. (Tr. 52). Plaintiff reported that he did not have any hobbies and generally watches television during his days. (Tr. 53). Plaintiff testified that he had a decreased appetite and difficulty sleeping, often waking up every hour and getting four to six hours of sleep a night, but occasionally sleeps up to eight hours when he is in and out of bed for 12 hours straight. (Tr. 54).

In response to the ALJ's questioning, plaintiff testified that he received a work injury on May 22, 2000, but continued to work up to 2007 to support his children as a single parent. (Tr. 54-55). Plaintiff reported that he lost his job in November 2000, despite being on light duty, as his pain made sitting for more than 15 minutes unbearable and was out of work for a year and lived off savings. (Tr. 55). Plaintiff testified that he subsequently worked in retail positions, but experienced debilitating pain and often called in sick. (Tr. 55). Plaintiff testified that he was a pressman prior to his 2007 surgery and received sick pay for six months from his employer after the disability onset date of August 9, 2007. (Tr. 55). Plaintiff reported that he has not been

18

employed since the 2007 surgery because he is physically unable to do any work.  (Tr. 56).

## THE MEDICAL EXPERT'S TESTIMONY

Dr. Buban testified that she had provided responses to interrogatories issued by the ALJ in January of 2010.  (Tr. 38).  The ME testified that she subsequently reviewed additional medical evidence (Tr. 570-603, records from plaintiff's pain clinic treatment) and that these new hospital records did not change the medical opinions she put forth in her interrogatory responses that plaintiff suffered from disabling chronic pain syndrome.  (Tr. 38).  The plaintiff's attorney asked the ME to explain why plaintiff's psychological disability, which is a byproduct of plaintiff's chronic physical pain, was not evidenced until 2008.  *Id.*  The ME testified that individuals with chronic pain conditions often do not experience psychological effects from the pain at the outset of the physical condition; rather, the psychological effects are borne out of the continual nature of the chronic pain and that the first evidence of the psychological disability in the record was Dr. Kenford's 2008 report.  (Tr. 38-39).

Upon re-examination, the ALJ asked the ME how plaintiff met the somatoform 12.07 Listing regarding his chronic pain condition.  (Tr. 42).  The ME testified that plaintiff's disorder was most closely associated with Listing 12.07(A)(3)[2], regarding unrealistic interpretation of

---

[2] Listing 12.07 for Somatoform Disorders applies to "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."  The required level of severity for a Somatoform Disorder is met when the requirements in both A and B are satisfied:

    A. Medically documented by evidence of . . .

        3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury; AND

    B. Resulting in at least two of the following:

        1. Marked restriction of activities of daily living; or
        2. Marked difficulties in maintaining social functioning; or
        3. Marked difficulties in maintaining concentration, persistence, or pace; or
        4. Repeated episodes of decompensation, each of extended duration.

19

physical signs and sensations associated with the preoccupation or belief that one has a serious disease or injury.  (Tr. 42).

### THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The VE testified that plaintiff's past relevant work as a press operator was light and semiskilled work and that his past relevant work as a carpenter was heavy and skilled.  (Tr. 60). The ALJ asked the VE to consider an individual with plaintiff's education and past relevant work, who can occasionally lift 20 pounds, frequently lift 10 pounds, push or pull 10 pounds using hand or foot controls, and sit, stand or walk about six hours out of an eight-hour work day. Further, the individual cannot use ladders, ropes or scaffolds, cannot be exposed to unprotected heights or hazardous machinery, can only occasionally stoop or crouch, and is limited to performing simple, repetitive tasks in a static setting that does not impose fast pace or strict production standards with only superficial interpersonal exchanges.  (Tr. 61).  Based on this hypothetical, the VE testified that such an individual could not do plaintiff's past relevant work due to the heavy physical demands and exposure to hazardous machinery.  (Tr. 61).  The VE further testified that such an individual could perform light, unskilled jobs such as packager, inspector, sedentary inspector, and sorter.  (Tr. 61-62).  The ALJ asked the VE to consider this same individual with the additional physical restriction of no more than occasional overhead reaching.  (Tr. 62).  Based on this additional restriction, the VE testified that such an individual would still be able to perform the jobs of packager, inspector, sedentary inspector, and sorter. (Tr. 62).

The plaintiff's attorney asked the VE to consider an individual who cannot do fast-paced work, cannot bend forward at the waist, or stoop, or do any overhead lifting, and is able to lift 20

20

pounds occasionally and 10 pounds frequently.  (Tr. 63).  The VE testified that such an

individual would still be able to do the jobs listed, but that less jobs would be available based on

the restriction of no stooping.  (Tr. 63).  Plaintiff's attorney further asked the VE to consider an

individual who would be absent from work two to three times a month or more, or would be

delayed or have to leave work early due to pain.  (Tr. 63).  The VE testified that such an

individual would not be able to maintain a job.  (Tr. 63).  Lastly, the plaintiff's attorney asked the

VE to consider an individual who would not be able to do these jobs sitting in a straight chair for

eight hours a day and who would require the accommodation of working in a reclining chair.

(Tr. 63).  The VE testified that such an individual would not be able to do any of the jobs

previously listed.  (Tr. 63).

## OPINION

Plaintiff assigns three errors in this case: (1) the ALJ unreasonably accorded "little

weight" to Dr. Buban's medical opinion; (2) the ALJ unreasonably discounted the opinion of

treating physician Dr. Kahn and the findings from the FCE; and (3) the ALJ erred in determining

plaintiff's credibility.  For the reasons that following, the Court determines that the ALJ's

decision is not supported by substantial evidence and this matter should be reversed and

remanded for further proceedings.

## I.  The ALJ unreasonably accorded only "little weight" to Dr. Buban.

In weighing the various medical opinions of record, an ALJ must consider factors such as

the length, nature and extent of the treatment relationship; the frequency of examination; the

medical specialty of the physician; how well-supported by evidence the opinions are; and how

consistent an opinion is with the record as a whole.  20 C.F.R. § 416.927(d)(2)-(6); *Ealy v.*

21

*Comm'r*, 594 F.3d 504, 514 (6th Cir. 2010).  When evaluating medical opinions, an ALJ must generally accord greater weight to the opinions of a treating physician than to those of a physician who examined a claimant only once.  *Walters v. Comm'r*, 127 F.3d 525, 530-31 (6th Cir. 1997).  The opinion of a non-treating but examining source is generally entitled to more weight than the opinion of a source who has not examined the claimant.  *Ealy*, 594 F.3d at 514 (citing 20 C.F.R. § 404.1527(d)(1); *Smith v. Comm'r*, 482 F.3d 873, 875 (6th Cir. 2007)).  The weight to be accorded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinion and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources.  20 C.F.R. § 416.927(d)(3).

Dr. Buban completed medical interrogatories on January 26, 2010, and opined that plaintiff suffered from "pain disorder associated with general medical condition and psychological factors." (Tr. 564).  Dr. Buban opined that plaintiff had marked limitations in maintaining social functioning, concentration, persistence and pace; moderate limitations in daily living activities; and no episodes of decompensation.  (Tr. 565).  In rendering her opinion, Dr. Buban relied on Dr. Kenford's consultative examination and determined that plaintiff's preoccupation with his pain and his frustration with his medical treating sources and insufficient pain medication reduced his tolerance for stress and his ability to get along with others.  (Tr. 565).  Dr. Buban opined that plaintiff suffered from a chronic pain syndrome post-laminectomy ("failed back syndrome") that met or equaled Listing 12.07 with an onset date of February 19, 2008, the date of Dr. Kenford's evaluation.  (Tr. 565-66).  At the ALJ hearing, Dr. Buban testified that she maintained the opinions proffered in her responses to the interrogatories despite

additional evidence entered into the record subsequent to the completion of her interrogatories. (Tr. 38).

The ALJ placed little weight on Dr. Buban's responses to medical interrogatories and testimony, finding they were not well-supported by the medical evidence of record.  (Tr. 23). The ALJ found that Dr. Buban's opinion was inconsistent with medical evidence received after she provided her interrogatory responses, which included findings that plaintiff suffered from only mild depression.  *Id*.  The ALJ further determined that Dr. Buban's opinions were inconsistent with the objective medical evidence and plaintiff's reported daily activities.  *Id*.

The ALJ's finding that Dr. Buban's opinion was entitled to little weight is without substantial support in the record.  In discounting Dr. Buban's opinion, the ALJ relied heavily on a perceived inconsistency between her interrogatory answers and testimony and a February 10, 2010 outpatient examination where plaintiff was diagnosed with mild to minimum depression (Tr. 23, citing Tr. 592), an "inconsistency" that has no basis in the medical evidence. Specifically, the ALJ stated:

> Dr. Buban opined that the [plaintiff] met listing 12.07(A)(3) & (B) beginning December of 2008.  However, additional mental health evidence was received after she rendered her opinion.  At the hearing, Dr. Buban was questioned about this and she acknowledged that said evidence indicated that the [plaintiff's] depression was only slightly above mild in severity.  She further noted that the [plaintiff] declined medication.  Nevertheless, in spite of these findings, Dr. Buban stated her opinion had not changed.  Dr. Buban's interrogatories are not well-supported by the medical evidence or record, particularly the evidence [that plaintiff suffered from only mild depression].

(Tr. 23).  However, Dr. Buban provided no diagnosis of depression in either her January 26, 2010 responses to medical interrogatories or her February 25, 2010 testimony at the ALJ hearing. Rather, Dr. Buban reported that plaintiff suffered from a "pain disorder with general medical

condition and psychological factors" and testified that she based her findings on Dr. Kenford's evaluation and not on medical evidence of depression[3], such as the February 10, 2010 evidence. (Tr. 40-41).  There is no contrary medical opinion in the record that supports the ALJ's inference that plaintiff's pain syndrome is related to a diagnosis of depression or that the absence of severe depression minimizes the severity of plaintiff's pain disorder.  Neither Dr. Buban nor Dr. Kenford based their opinions on evidence related to the severity of plaintiff's depression.  Rather, Dr. Buban testified that plaintiff's chronic pain syndrome specifically manifested in anger, as opposed to depression.  (Tr. 40).  Moreover, Dr. Rivera's opinion, which was afforded great weight, is completely silent as to how or whether depression is an aspect of plaintiff's pain syndrome.

There is no medical evidence in the record, aside from the ALJ's own opinion, that Dr. Buban's opinion is inconsistent with plaintiff's diagnosis of mild depression.[4]  Notably, during

---

[3] This is especially significant in light of the nature of plaintiff's diagnosis.  As Dr. Kenford's evaluation explains, plaintiff fixates on his physical pain and denies any mental health issues.  (Tr. 355-60).  In support of this opinion, Dr. Kenford noted that plaintiff expressed anger at a doctor who prescribed him medication for mental health treatment stating that his only problem is a lack of adequate pain management.  (Tr. 355).

[4] In fact, the diagnostic criteria for Pain Disorder set forth in the DSM-IV excludes mood disorders as a basis for the pain:

    A. Pain in one or more anatomical sites is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention.

    B. The pain causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

    C. Psychological factors are judged to have an important role in the onset, severity, exacerbation, or maintenance of the pain.

    D. The symptom or deficit is not intentionally produced or feigned (as in Factitious Disorder or Malingering).

    E. The pain is *not better accounted for by a Mood*, Anxiety, or Psychotic Disorder and does not meet criteria for Dyspareunia.

*See* http://www.behavenet.com/capsules/disorders/paindisorder.htm.

his questioning of the medical expert at the hearing, the ALJ did not elicit an explanation from Dr. Buban as to *why* her opinion remained unchanged.  While an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, the ALJ cannot substitute his own lay "medical" opinion for that of a treating or examining doctor.  As recognized by this Court, "[t]he ALJ must not substitute his own judgment for a doctor's conclusion without relying on other medical evidence or authority in the record."  *Mason v. Comm'r of Soc. Sec.*, No. 1:07-cv-51, 2008 WL 1733181, at *13 (S.D. Ohio April 14, 2008) (Beckwith, J.; Hogan, M.J.) (citing *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963); *Clifford v. Apfel*, 22.7 F.3d 863, 870 (7th Cir. 2000); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985); *Sigler v. Sec'y of H.H.S.*, 892 F. Supp. 183, 187-88 (E.D. Mich. 1995)).  *See also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2nd Cir. 1999) ("[T]he ALJ cannot arbitrarily substitute his own opinion for competent medical opinion."); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings").  In the absence of a medical opinion to support his inference that plaintiff's pain syndrome is related to the severity of plaintiff's depression, the ALJ erred by substituting his own "medical opinion" for that of Dr. Buban's.  Accordingly, the ALJ's decision to place little weight on Dr. Buban's opinion based on this alleged inconsistency is not supported by substantial evidence.

The ALJ's finding that Dr. Buban's opinion is not supported by the medical evidence or plaintiff's activities of daily living is also without substantial support in the record.  In forming her opinions, Dr. Buban relied on Dr. Kenford's report (Tr. 352-60); records from Grandview Medical Center documenting plaintiff's August 2007 surgery and November 2007 MRI (Tr. 317-

32, 318); and records from plaintiff's pain clinic treatment covering February to December 2007
(Tr. 333-40) which documented plaintiff's level of pain and complaints of anger and depression.
(Tr. 564).  This medical evidence, specifically Dr. Kenford's report, supports Dr. Buban's
opinion that plaintiff has marked impairments resulting from his pain disorder that meet Listing
12.07.  The only contrary opinion in the record is the RFC completed by non-examining agency
psychologist Dr. Rivera, who opined that plaintiff was moderately, as opposed to markedly,
impaired in his ability to complete simple repetitive tasks and manage stress (Tr. 366), and whose
opinion was inconsistent with those of Drs. Kenford and Buban.

In addition, and contrary to the ALJ's assertion, the evidence in the record pertaining to
plaintiff's daily activities is not inconsistent with Dr. Buban's opinion.  The ALJ determined that
plaintiff's activities, including frequent walks, shopping for groceries, and occasional household
work, supported no more than moderate limitations as opposed to the marked limitations found
by Dr. Buban.  However, a review of the record indicates that while plaintiff acknowledged
doing these activities he qualified his ability to complete these tasks depending on the day and
amount of pain he experienced.  *See, e.g.,* (Tr. 358) ("[Plaintiff] explained that the doctors tell
him he needs to exercise more and that it will help his pain, but he reported that the pain is too
intense for him to engage in exercise.  He reported that he will do his laundry if he feels able to
. . . he reported he can cook on his good days and on his bad days he 'eats yogurt and crackers'
. . . [he] will sometimes do some cleaning 'on a good day.'"); (Tr. 530) (plaintiff describes his
functional level as being at 20%); (Tr. 52-53) (plaintiff testified that he usually watches
television at home in a reclined position, that he has days where he can't do any chores or even
sit or lay down comfortably due to excruciating pain, and that he limits his shopping items to ten

26

pounds per trip and when he returns home he needs a recovery period and often takes pain medication).  Although plaintiff reported doing these activities, his qualifying statements that his pain significantly interferes with his ability to do them on a regular basis or without significant resting periods are not inconsistent with Dr. Buban's finding that plaintiff's focus on his pain markedly impairs his abilities to maintain social functioning, concentration, persistence, and pace.  Viewing the record in its entirety, the ALJ's claim that Dr. Buban's opinion was inconsistent with the evidence of plaintiff's daily activities is not supported by substantial evidence.

Finally, to the extent the ALJ gave limited weight to Dr. Kenford's opinion, upon which Dr. Buban relied, the ALJ's decision lacks substantial support in the record.  The ALJ discounted Dr. Kenford's opinion citing: (1) inconsistencies with her finding that plaintiff's ability to maintain attention, concentration and persistence was largely unimpaired and her finding that plaintiff was markedly impaired in his ability to perform simple repetitive tasks, and (2) inconsistencies between her findings and plaintiff's reports of daily activities.  (Tr. 23).  Aside from these two points, the ALJ did not cite to any other inconsistencies in the record that contradicted Dr. Kenford's diagnosis or findings on plaintiff's functional limitations.

Regarding the purported internal inconsistencies, Dr. Kenford reported:

[Plaintiff's] ability to perform a simple repetitive task at this time is felt to be markedly impaired by his pain condition.  [Plaintiff] is acutely aware of and attuned to his pain.  His entire psyche revolves now on his thoughts of relief from pain.  [Plaintiff] evidenced significant drug-seeking behavior which needs to be monitored.  At this time he is not able to apply his good underlying intellect in a goal-oriented or focused way.  It is felt that if he gains some relief from his pain condition, that [plaintiff] has the intellect to be able to do tasks of considerable complexity.

27

(Tr. 360). In weighing Dr. Kenford's opinion the ALJ was required to consider this supporting explanation, yet his opinion is silent on the matter. *See* 20 C.F.R. § 416.927(d)(3). The ALJ failed to articulate why Dr. Kenford's explanation fails to support her conclusion that plaintiff's pain disorder markedly impairs his ability to perform simple repetitive tasks. Dr. Kenford further opined:

> [Plaintiff's] ability to handle the everyday stresses and pressures of a work environment is considered extremely impaired. He has no psychological resources or resilience. Whenever he experiences any stress or challenge, he feels an increase or augmentation in his subjective pain. As soon as [plaintiff] starts to experience pain, he fixates on it and can only think of relief. He is in a vicious cycle.

(Tr. 360). The ALJ's opinion also ignores this finding and supporting explanation, in contravention of the requirements of 20 C.F.R. § 416.927(d)(3), despite its inherent import in determining whether plaintiff has the mental capacity to engage in a full eight-hour work day. Considering these supporting explanations in conjunction with Dr. Kenford's clinical findings, her opinion that plaintiff's ability to accomplish brief, low-stress tasks is not inconsistent with her determination that he is incapable of handling the stress of full time employment. The ALJ's failure to provide any cogent analysis as to why Dr. Kenford's explanations should be disregarded prevents this Court from performing any meaningful judicial review thereof.

With regard to the second basis for discounting Dr. Kenford's opinion, the ALJ's decision is not substantially supported by the record. As discussed above, while plaintiff reported doing some housework and grocery shopping, the record as a whole demonstrates that plaintiff is often unable to do *any* work depending on the level of pain he experiences on a given day. Accordingly, the evidence pertaining to plaintiff's daily activities is not inconsistent with

Dr. Kenford's determination that he is incapable of handling the stress of a full work day due to his chronic pain syndrome.

In light of the evidence in the record, the ALJ erred in weighing the opinions of Dr. Buban and Dr. Kenford.  Plaintiff's first assignment of error should be sustained.

## II.  The plaintiff's second assignment of error should be overruled in part and sustained in part.

In his second assignment of error, plaintiff asserts the ALJ erred by failing to clearly articulate his rationale for discounting the FCE performed by physical therapist Cynthia Lear. Plaintiff further argues that the ALJ's opinion should be reversed due to his failure to address the opinion of Dr. Kahn who performed plaintiff's second back surgery.

With regard to the FCE performed by physical therapist Lear, plaintiff's argument is not well-taken.  In May 2009, plaintiff met with physical therapist Cynthia Lear who conducted a FCE.  (Tr. 521-26).  Ms. Lear opined that plaintiff would likely not be successful in vocational rehabilitation and "without adequate pain control/management, sustained employment is unlikely at this time."  (Tr. 521).

The ALJ cited several reasons for placing little weight on the FCE and Ms. Lear's opinion.  (Tr. 22).  First, the ALJ found that plaintiff's allegations and performance at the FCE were markedly inconsistent with clinical signs documented by treating physicians plaintiff saw shortly before and after the FCE.  (Tr. 22).  While the ALJ did not cite to any specific exhibits or evidence in this regard, because the ALJ discussed plaintiff's treatment history from his first surgery to his most recent treatment, including records inconsistent with the FCE (Tr. 18-19), this reason for discounting Ms. Lear's opinion of disability is adequately supported.

The ALJ also stated there were no objective validity tests used to determine whether the

29

plaintiff gave full effort during the FCE.  (Tr. 22).  Plaintiff contends that his activity level the day of the FCE was consistent with that of his previous physical therapy sessions and that "objective" findings readily observable by Ms. Lear (*e.g.*, flat affect, masked facies, no spontaneous rotation or flexion/extension of the head/neck or trunk) confirm the validity of the FCE results.  (Doc. 8 at 13).  Plaintiff also suggests the ALJ misapplied Social Security Ruling 06-3p in evaluating Ms. Lear's opinion.

Even if the reasons cited by plaintiff tend to support the validity of the FCE results, the specific reason given by the ALJ–the lack of any objective validity test to evaluate plaintiff's effort during the FCE–still stands unrebutted and is an adequate reason for discounting Ms. Lear's opinion of disability.

More importantly, the ALJ was free to discount Ms. Lear's conclusion related to plaintiff's functional capacity because as a physical therapist, Ms. Lear was not a "medical source" who was qualified to assess the severity of plaintiff's impairments and functioning.  The ALJ correctly determined that the physical therapist is not an acceptable medical source under the Social Security regulations.  *Compare* 20 C.F.R. § 404.1513(a) (acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists and qualified speech-language pathologists), with 20 C.F.R. § 404.1513(d)(1) (medical sources not listed in § 1513(a), such as nurse practitioners, physicians' assistants, naturopaths, chiropractors, audiologists and therapists are considered to be "other sources" rather than "acceptable medical sources").  *See also Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x 358, 363 (6th Cir. 2001) (physical therapist's report not afforded significant weight because therapist not recognized as an acceptable medical source); *Jamison v. Comm'r*, No. 1:07-cv-152, 2008 WL

2795740, at *10 (S.D. Ohio July 18, 2008) (Dlott, J.) (same).  Because physical therapists are not considered acceptable medical sources under the regulations, the ALJ was not required to give any special deference to Ms. Lear's functional capacity evaluation.

Nor has plaintiff shown that the ALJ violated SSR 06-03p by discrediting the opinion of Ms. Lear on the ground she is not a medical source.  The Social Security rulings and regulations provide that a physical therapist such as Ms. Lear may provide insight into the severity of the impairment and how it affects the individual's ability to function, *see* 20 C.F.R. § 404.1513(d), and it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.  *See* SSR 06-03p.  However, SSR 06-03p recognizes that evidence from an "acceptable medical source" is required to establish the existence of a medically determinable impairment.  As indicated above, Ms. Lear is not an acceptable medical source.  *See* 20 C.F.R. § 404.1513(a).  Nor is there is any evidence in the record that Ms. Lear had ever seen plaintiff prior to the date of her one-time evaluation.  The ALJ did not err by declining to adopt the opinion of Ms. Lear as to the severity of plaintiff's condition.  For these reasons, the ALJ's decision to place little weight on the therapist's FCE is substantially supported by the record.

However, plaintiff's argument that the ALJ erred by failing to properly address and give significant weight to the opinion of Dr. Kahn is well-taken.  On April 10, 2008, Dr. Kahn performed plaintiff's second back surgery, an anterior spinal decompression with partial vertebrectomy and fusion.  (Tr. 481).  At plaintiff's initial follow-up visit in May 2008, Dr. Kahn noted that plaintiff's x-rays "look absolutely great" and encouraged plaintiff to continue his

31

walking regimen of up to two miles a day.  (Tr. 480).  Nevertheless, Dr. Kahn stated that plaintiff

had not been able to work since August 2007 and "[h]e is certainly going to be off through

August [2008] and may have to go on a permanent disability depending."  (Tr. 480).

    In his written decision, the ALJ only included the positive notes in Dr. Kahn's report: that

plaintiff was walking up to two miles a day, showing significant improvement, and doing "well

enough."  (Tr. 19).  There is no mention whatsoever of Dr. Kahn's opinion that plaintiff was

unable to work from August 2007 to August 2008 or that plaintiff may be permanently disabled.

    Social Security Ruling 96-5p provides guidelines for considering "medical source

opinions on issues reserved to the Commissioner, including . . . whether an individual is

'disabled' under the Social Security Act."  SSR 96-5p, 1996 WL 374183, at *1 (July 2, 1996).

"For purposes of SSR 96–5p, 'medical opinions' are defined as 'statements from physicians and

psychologists or other acceptable medical sources that reflect judgments about the nature and

severity of [the claimant's] impairment(s).'"  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269,

272 (6th Cir. 2010) (citing SSR 96-5p, 1996 WL 374183, at *2).  While the ultimate issue of

disability is reserved to the Commissioner, a treating physician's opinion that his patient is

"disabled" must not be disregarded.  SSR 96-5p, 1996 WL 374183, at *5.  SSR 96-5 specifically

provides:

> [O]pinions from any medical source on issues reserved to the Commissioner must
> never be ignored.  The adjudicator is required to evaluate all evidence in the case
> record that may have a bearing on the determination or decision of disability,
> including opinions from medical sources about issues reserved to the Commissioner.
> If the case record contains an opinion from a medical source on an issue reserved to
> the Commissioner, the adjudicator must evaluate all the evidence in the case record
> to determine the extent to which the opinion is supported by the record.

SSR 96-5p, 1996 WL 374183, at *3.  "[W]hen an ALJ fails to mention relevant evidence in his

or her decision, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Bledsoe v. Comm'r of Soc. Sec.*, No. 09cv564, 2010 WL 5795503, at *3 (S.D. Ohio Aug. 31, 2010) (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

Here, the ALJ's opinion makes no mention whatsoever of Dr. Kahn's opinion as to plaintiff being disabled for at least one year subsequent to his claimed onset date of disability nor his opinion that plaintiff may be permanently disabled. Regardless of whether Dr. Kahn's opinion is entitled the controlling weight, the ALJ was required by SSR 96-5p to consider this evidence. Accordingly, this matter should be remanded for further evaluation consistent with the ALJ's statutory and regulatory duties.

### III. The plaintiff's third assignment of error should be sustained.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky*, 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)). The ALJ's credibility decision must include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual

33

receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c); SSR 96-7p.

In finding that plaintiff's allegations of pain and limitations were not fully credible, the ALJ determined that the objective medical evidence did not support plaintiff's allegations (Tr. 18); that medical records after plaintiff's April 2008 surgery noted his x-rays looked great and he was able to walk up two miles (Tr. 19, citing Tr. 480);  that plaintiff still walked up to one mile per day, even during periods of increased pain (Tr. 19, citing Tr. 592); that plaintiff was generally unwilling to take any medication or receive treatment despite allegations of anxiety and depression (Tr. 20, citing Tr. 410, 585-88); and that plaintiff's activities of daily living were not indicative of disabling symptoms and limitations.  (Tr. 20, citing Tr. 222-25).  The ALJ's credibility finding lacks substantial evidentiary support in three important respects.

First, as discussed above, the ALJ failed to consider Dr. Kahn's assessment of disability. The ALJ relied on the more positive aspects of Dr. Kahn's report to bolster his credibility finding to the exclusion of the portions of the report which indicated plaintiff was more limited than suggested by the ALJ.  (Tr. 19, citing Tr. 480).  The ALJ may not selectively reference a portion of the record which casts plaintiff in a capable light to the exclusion of those portions of the record which do not.  *See Howard v. Comm'r*, 276 F.3d 235, 240-41 (6th Cir. 2002).  To the extent the ALJ failed to consider the restrictions imposed by Dr. Kahn and to articulate the reasons for rejecting such limitations, the ALJ's credibility finding on this same issue is not

34

supported by substantial evidence.

Second, as discussed above in connection with the ALJ's assessment of Dr. Buban's opinion, plaintiff's daily activities, when viewed in the context of the record as a whole, do not undermine his credibility.  The ALJ noted that plaintiff lived independently and did household chores, such as laundry, dishwashing, vacuuming, lawn mowing, and cooking.  (Tr. 20, citing Tr. 222-24).  However, the record demonstrates that plaintiff reported significant difficulties in accomplishing the simplest tasks.  *See, e.g.,* Tr. 222 (plaintiff reported that he can usually feed himself but stumbles to the fridge to eat when he experiences pain; that his pain sometimes makes it impossible to get to the toilet; and that he makes sandwiches or eats yogurt or frozen dinners as opposed to complete meals); (Tr. 223) (plaintiff reported that he does dishes one to two times a week; cleans and/or vacuums once a month; and sometimes mows his lawn, but only every three to four weeks or less with his neighbors helping him half the time).  The ALJ further noted that plaintiff was able to grocery shop (Tr. 20, citing Tr. 223).  However, as discussed above, plaintiff's ability to shop is restricted in that he limits his purchases to what he is able to carry home and he must rest afterwards.  (Tr. 52).

The ALJ also cited to a third-party function report completed by plaintiff's mother to support his credibility determination, noting her statements that on a typical day plaintiff walks, completes housework, watches television, attends church on a regular basis, and is able to get around without assistance.  (Tr. 20, citing Tr. 253, 257).  However, the ALJ did not address significant portions of this report, notably that plaintiff's mother reported that *all* he did from the time he wakes until going to bed was watch tv, do housework, and walk (Tr. 253); that he was unable to maintain his home (Tr. 254); that he needed help with the yard, cleaning, and house

35

maintenance (Tr. 255); that he has to rest while he's doing chores and spends less time cooking due to pain (*Id*.); and that he is only able to walk when he is not in pain and has no social life since his surgery.  (Tr. 257).  Once again, the ALJ improperly cited to selected portions of the third party report to support his credibility decision.  *Howard,* 276 F.3d at 240-41.

The ALJ further noted that plaintiff "routinely told his treating physicians how he walked up to one mile daily."  (Tr. 20).  However, the record demonstrates that plaintiff's ability to walk, as recommended by his doctors, was dependent on his level of pain on any given day.  (Tr. 48).  For example, contrary to the ALJ's statement that in December 2007 plaintiff reported he could walk "*at least* one mile" (Tr. 19), the treatment note shows that plaintiff actually reported that he was "having difficulty walking" and "can't walk *more than* 1 mile."  (Tr. 411).  While the ALJ noted that plaintiff walked up to one mile a day even during reports of increased pain (Tr. 19, citing Tr. 592), a review of the clinic note shows his ability to walk was qualified in that "at times" he could walk one mile a day.  (Tr. 592).  Also, physical therapy, pain clinic, and emergency department notes document plaintiff's decreased ability to walk, increased pain with walking, and limited mobility.  (Tr. 515, 523, 543, 544, 547, 586, 587, 592).  Again, the ALJ's selective referencing of the record is impermissible.  *See Howard at* 240-41.  Accordingly, as the ALJ failed to consider the entirety of the record regarding plaintiff's daily activities, his credibility determination on these grounds is not supported by substantial evidence.

Third, the ALJ discounted plaintiff's credibility based on his failure to seek mental health treatment or take medication for his mental impairments.  Throughout his opinion and credibility determination, the ALJ placed significant emphasis on plaintiff's lack of mental health treatment: "In February of 2008, [plaintiff] reported that his depression was not severe and that he would

not take medications." (Tr. 20, citing Tr. 355); "[Plaintiff] complained of 'lots of anxiety' on

May 23, 2008, but noted that he 'doesn't want to take meds for it.'" (Tr. 20, citing Tr. 410);

"Additionally, the [plaintiff] did not generally receive the type of care one would expect for an

individual suffering from disabling mental impairments.  There is no evidence of consistent

mental health counseling, aside from a consultative evaluation performed at the behest of the

Administration.  Further, the [plaintiff] has required no psychiatric hospitalizations.  The

[plaintiff] also does not take any medications for his allegedly disabling mental symptomology."

(Tr. 20); "[Plaintiff] stopped taking his medication after his [sic] learned it was for bipolar

disorder and psychotic symptoms."  (Tr. 20, citing Tr. 355); "[Plaintiff] reported in November of

2009, that he was neither receiving, nor interested in receiving, mental health treatment."  (Tr.

20, citing Tr. 586-88).

Here, plaintiff was found to have the severe mental impairment of chronic pain disorder.

(Tr. 14).  "For some mental disorders, the very failure to seek treatment is simply another

symptom of the disorder itself."  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009)

(citing *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009)).  "[F]ederal courts have

recognized that a mentally ill person's noncompliance with psychiatric medications can be, and

usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without

justifiable excuse."  *Pate-Fires*, 564 F.3d at 945 (internal quotations omitted) (and numerous

cases cited therein).  Further, both Dr. Kenford and Dr. Buban provided diagnoses and/or

testimony explaining that one aspect of plaintiff's mental impairment is his fixation on his

physical symptoms and refusal to acknowledge or accept mental health treatment.  Despite these

findings, the ALJ relied heavily on plaintiff's failure to seek mental health treatment or

37

medication in determining that plaintiff was not credible.  In cases such as this, where the plaintiff's mental impairment may itself be the cause of his failure to seek treatment or take medication as prescribed, it is improper to use the lack of treatment as a basis for discrediting plaintiff.  *See Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989) (questioning the practice of censuring claimants with mental impairments for exercising poor judgment in not seeking treatment).  Accordingly, the Court finds the ALJ erred in this aspect of the credibility determination.  Plaintiff's third assignment of error should be sustained.

**IV.  This matter should be remanded for further proceedings.**

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation.  All essential factual issues have not been resolved in this matter.  *Faucher,* 17 F.3d at 176.  The Court notes that although the record strongly supports a finding of disability for a closed period from plaintiff's first surgery through August 2008, plaintiff's entitlement to ongoing benefits is dependent upon a resolution of the errors identified in this Report and Recommendation.  *Id*.  Accordingly, it is recommended that this matter be reversed and remanded under Sentence Four of § 405(g) for further proceedings with directions to the ALJ to reconsider the weight to be accorded to the opinions of Dr. Buban, Dr. Kahn, and Dr. Kenford, and an explanation on the record therefor, and reconsideration of plaintiff's credibility.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **REVERSED** and **REMANDED** for further

proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).


Date: 9/26/2011                                  s/Karen L. Litkovitz

                                                 Karen L. Litkovitz

                                                 United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MICHAEL P. WAGNER,                               Case No. 1:10-cv-784

     Plaintiff                               Beckwith, J.
                                                 Litkovitz, M.J.
     vs

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

     Defendant

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).